2001 UT 43

**Michael N. MACRIS, Valerie A. Macris, and Southern Cross Irrevocable Trust by and through its Trustee, Roger Pankow, Plaintiffs and Appellants,**

v.

**SCULPTURED SOFTWARE, INC., a Utah corporation and George C. Metos, an individual, Defendants and Appellees.**

No. 990192.

Supreme Court of Utah.

May 25, 2001.

Stephen T. Hard, Roger D. Sandack, Salt Lake City, for plaintiffs.

Alan L. Sullivan, Carol Clawson, Bryon J. Benevento, Salt Lake City, for defendants.

HOWE, Chief Justice:

¶ 1 Plaintiffs brought this action for damages arising from the alleged conversion by defendants of plaintiffs' stock in Sculptured Software, Inc. Before trial, the parties stipulated to the dismissal of the claims of plaintiffs Michael Macris and Southern Cross Irrevocable Trust. The trial court held that the claim of Valerie Macris was barred by section 78–12–26(2) of the Utah Code, which requires an action for the taking of personal property to be brought within three years. Valerie Macris appeals.

## BACKGROUND

¶ 2 Sculptured Software, Inc. (SSI), a closely held computer game company, was incorporated on July 12, 1985, by George Metos, Michael Macris, and Robert Burgener. Each of them received 270,000 shares in the new company. Burgener's stock was held in trust by Southern Cross Irrevocable Trust with Mr. Macris as trustee. Mr. Macris owned his shares jointly with his wife, Valerie Macris.

¶ 3 In early 1986, these principals decided they could no longer work together and began to negotiate for SSI to buy out the Macrises and Burgener for a percentage of development or investment funds they had paid to SSI for development, plus the potential of additional payments from any earned

royalties if any of the games were ultimately successful. Several documents memorialized the parties'· intent and agreement, the effect of which was disputed at trial. The trial court found that a Consulting and Marketing Agreement (Consulting Agreement) and an Agreement of Purchase and Sale of Stock (Purchase Agreement) constituted a single buyout-agreement package.[1] Because this case now focuses on the impact of these two agreements on Valerie Macris's claims, we discuss only them.

¶ 4 The Consulting Agreement made between SSI and Macris & Associates, a company wholly owned by Mr. and Ms. Macris, provided for the payment of advance royalties or commissions to compensate Mr. Macris and others for their efforts in securing investors to fund two projects for SSI. Specifically, Mr. Macris would receive a percentage of the funding SSI received for three programs funded by Mind Games, Ltd. SSI would also pay him five percent of the total advance royalty paid to SSI by Access Software as defined in an agreement between SSI and Access for royalties on sales of SSI games.

¶ 5 Pursuant to the terms of the Purchase Agreement, the Macrises and Southern Cross agreed to sell· their SSI stock back to SSI in exchange for any royalties to be earned on future sales of the games. These "back-end royalties" were dependent on the success of nine specified games, thereby differing from the advance royalties paid on initial investments in SSI under the Consulting Agreement.

¶ 6 As required by the Purchase Agreement, SSI retained legal counsel to draft an escrow agreement for payment into escrow of royalties earned on the specified computer games directly from the companies paying the royalties, secured by "irrevocable letters" made between SSI and those companies. The stock certificates were endorsed in blank by Michael Macris on behalf of the Macrises and Southern Cross so that when the escrow requirements were completed, the certificates would be delivered to SSI without any further involvement of the parties. Mr. Macris endorsed and delivered the certificates he held in joint tenancy with his wife to counsel for SSI pending the preparation of the irrevocable letters.

¶ 7 On January 21, 1986, Mr. Macris was presented with the irrevocable letters. He immediately objected to the form and demanded the return of the stock certificates. The escrow agent complied. Metos attempted to contact Mr. Macris and sent him a letter inquiring about the basis of his objection. Metos received no response because the Macrises had moved and had not informed him or SSI of their new address. Metos then arranged for royalty payments to be made to the escrow account.

¶ 8 Distrust between Metos and Mr. Macris continued to grow. Metos demanded that Mr. Macris surrender· the stock certificates before he would pay the Macrises and Southern Cross any further advance royalties. Mr. Macris surrendered the stock certificates to Metos in early February 1986. Mr. Macris was then given a check for the advance royalties.

¶ 9 Mr. Macris told his wife that he had surrendered their certificates to Metos and subsequently "reported the substance of the meeting to her." SSI canceled the Macrises' and Southern Cross's stock certificates in February 1986, and reissued the shares to other investors. From February to May 1986, Metos and Burgener worked to obtain the necessary irrevocable letters required under the Purchase Agreement. Mr. Macris signed a subsequent escrow agreement on his and his wife's behalf.

¶ 10 In June 1987, SSI mailed the Macrises a letter stating that the computer game sales had not reached the point requiring distribution of royalties to the Macrises under the Purchase Agreement. The letter was sent to the Macrises' former address, and they denied receiving it. Mr. Macris tried to reach Metos in 1986 or 1987 to request information on SSI's financial condition, and Ms. Macris

---

1. The case was initially before Judge Stirba but was later reassigned to Judge Quinn. All references hereafter to the trial proceedings refer to the case before Judge Quinn unless indicated otherwise.

became aware that Metos would not return her husband's calls.

¶ 11 SSI and Mr. Metos had no further dealings with the Macrises until April 1988 when Mr. Macris demanded to have an accountant inspect SSI's books. SSI refused the demand to open all of its books, providing only the records relating to the nine games designated in the Purchase Agreement. On April 29, 1988, Metos sent a written notice to Mr. Macris explaining SSI's refusal to open its books and detailing the reasons royalties had not been paid on the nine computer software games designated in the Purchase Agreement. The Macrises did not respond to the written notice. Mr. Macris testified he believed he had a legal right at that time to see the books of SSI but made a decision in 1988 "not to proceed with legal action" against SSI and Metos for refusing him access to SSI's records. Ms. Macris knew of the attempted audit and SSI's refusal to allow all of its books to be inspected. On October 9, 1995, SSI merged with Acclaim Entertainment, Inc. (Acclaim), a publicly traded software company. In exchange for his shares, Metos received 1,012,500 shares of restricted stock in Acclaim.

¶ 12 The Macrises brought this action in November 1995 alleging that they did not sell their stock in 1986, but placed it in a trust of which they were beneficiaries. The trial court rejected Mr. Macris's testimony that he told Metos to "make something of the stock" for the Macrises. Instead, the court found that Metos did not agree to hold the stock certificates on behalf of others. Moreover, the Macrises both testified that the Consulting Agreement was satisfied in full by May 1986. Ms. Macris moved for partial summary judgment, asserting that her stock was converted in February 1986 because she did not sign the stock certificate and therefore her interest could not have been transferred to Metos or SSI. Judge Stirba granted the motion, holding that the Macrises stock had been converted and that exceptional circum-

stances tolled the running of any applicable statute of limitations until Ms. Macris learned of the merger of SSI and Acclaim. Judge Stirba then took leave, and the case was reassigned to Judge Quinn. In a three-day trial on the merits, Judge Quinn found that an agency relationship existed such that Mr. Macris's knowledge of the facts surrounding the conversion should be imputed to Ms. Macris. He did not disturb Judge Stirba's holding that there had been a conversion, but held that the three-year statute of limitations in section 78–12–26(2) of the Utah Code barred recovery. That section provides in pertinent part:

An action may be brought within three years

. . . .

(2) for taking, detaining, or injuring personal property, including actions for specific recovery thereof. . . .

Utah Code Ann. § 78–12–26(2) (1996).

¶ 13 Ms. Macris appeals, contending that (1) the limitation period should have been tolled until she had notice of the conversion in 1995, and (2) Judge Quinn was bound by the law of the case doctrine to Judge Stirba's grant of partial summary judgment that Ms. Macris had no notice of the conversion until 1995 and that the statute of limitations was tolled until that time.[2] We address these issues in turn.

## STANDARD OF REVIEW

¶ 14 Facts forming the basis of this appeal cannot be overturned unless the findings of the trial court are "clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R.Civ.P. 52(a). The trial court's findings are clearly erroneous only if the ruling "contradicts the great weight of evidence or if [the] court reviewing the evidence is left with a 'definite and firm conviction that a mistake has been made.'" *Sevy v. Sec. Title Co. of So. Utah*, 902 P.2d

---

**2.** Ms. Macris assigns error to the trial court on two additional issues: (1) the court erred in determining that the underlying contracts constituted an integrated agreement to sell Ms. Macris's shares of SSI; and (2) the court erred in finding the statute of frauds did not bar Mr.

Macris from validly transferring Ms. Macris's shares. We need not discuss these issues because the trial court's decision was ultimately based on plaintiffs' claim that a conversion occurred, and we therefore limit our review to issues pertinent to that claim.

629, 635 (Utah 1995) (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)). We recite the facts accordingly. We review for correctness the legal application of the law of the case doctrine.

## ANALYSIS

### I. TOLLING OF THE STATUTE OF LIMITATIONS

¶ 15 Judge Stirba ruled that SSI converted the Macrises' stock when it cancelled their stock certificate in February 1986, and Judge Quinn did not disturb that ruling. Ms. Macris does not dispute that the three-year statute of limitations in section 78–12–26(2) applies to her claim.[3] She asserts, however, that the statute of limitations was tolled until October 1995 when she learned that SSI had merged with Acclaim and that her stock had been converted.

¶ 16 We have recognized three instances in which the "discovery rule" tolls the statute of limitations until the facts forming the basis for the cause of action are discovered: (1) when the discovery rule is mandated by statute; (2) when a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct; and (3) when the case presents exceptional circumstances and the application of the limitation would be irrational or unjust regardless of any showing that the defendant has prevented the discovery of the cause of action. *Warren v. Provo City Corp.*, 838 P.2d 1125, 1128 (Utah 1992).

¶ 17 Without citing a specific applicable statute, Judge Stirba ruled that exceptional circumstances tolled the statute of limitations from running until Ms. Macris's discovery of the 1995 merger. Ms. Macris

argues that section 78–12–26(2) or section 78–12–27 mandates use of the discovery rule. We hold that section 78–12–26(2) governs her claim and that the statute does not expressly mandate a discovery rule for "taking, detaining, or injuring personal property." [4] Utah Code Ann. § 78–12–26(2). Additionally, Ms. Macris does not contend that the statute should be tolled because of defendants' concealment or misleading conduct. Therefore, we are left to determine whether there are exceptional circumstances making limitation irrational or unjust.

¶ 18 We have previously noted:

The ultimate determination of whether a case presents exceptional circumstances that render the application of a statute of limitations irrational or unjust turns on a balancing test. *However, before a court reaches this test, an initial showing must be made that the plaintiff did not know of and could not reasonably have known of the existence of the cause of action in time to file a claim within the limitation period.*

*Warren*, 838 P.2d at 1129 (emphasis added) (citing *O'Neal v. Div. of Family Servs.*, 821 P.2d 1139, 1144 (Utah 1991)); *see also Atwood v. Sturm, Ruger & Co.*, 823 P.2d 1064, 1065 (Utah 1992) (holding discovery rule does not apply when plaintiff becomes aware of possible cause of action before statute of limitations expires); *Brigham Young Univ. v. Paulsen Constr. Co.*, 744 P.2d 1370, 1374 (Utah 1987) (same). Accordingly, we apply a two-step analysis under the exceptional circumstances doctrine. First, Ms. Macris must show she "did not know of and could not reasonably have known of the existence of the cause of action in time to file a claim within the limitation period." [5] *Warren*, 838

---

3. Before Judge Stirba, plaintiffs' counsel stated "[I]n this case, [when the conversion occurred] doesn't matter all that much because even if the conversion took place in '86 as I said, the next question is: When does she have reasonable notice?"

4. The discovery rule in subsection (2) of the statute expressly tolls the accrual of the limitation period for a claim for taking of livestock only where the claim does not accrue until "the owner has actual knowledge of such facts ... as

to the possession of the animal by the defendant." § 78–12–26(2).

5. We note that where there is a fiduciary relationship, as between a stockholder and a corporate officer, as there was here, generally the statute of limitations does not accrue until "the stockholder discovers, or in the exercise of reasonable care should discover, that there is a wrong to be complained of...." *Stewart v. K & S Co.*, 591 P.2d 433, 435 (Utah 1979). This standard is identical to the initial threshold standard enunciated in *Warren* outlining whether the ex-

P.2d at 1129. If she meets this threshold showing, a balancing test is applied to determine whether there are exceptional circumstances that render the application of a statute of limitations irrational or unjust. *Id.* We have held that all that is required to trigger the statute of limitations is sufficient information to put plaintiffs on notice to make further inquiry if they harbor doubts or questions. *Berenda v. Langford,* 914 P.2d 45, 51 (Utah 1996). Once inquiry notice triggers the accrual of the statute of limitations, a claimant may not then toll the running of the statute under the principle of exceptional circumstances.

¶ 19 The trial court held that Ms. Macris knew or should have known that their shares were converted no later than September 1988. Ms. Macris knew Mr. Macris was negotiating with Metos for a buyout of their shares and that the certificates had been given to SSI's attorney for delivery to Metos upon completion of the deal.

¶ 20 By February 1986, Ms. Macris knew her husband had a "falling out" with Metos, and she was aware of the distrust between them. She also knew Metos had not returned her husband's phone calls and that her husband had delivered the stock certificates to Metos. She acknowledged that this delivery affected her interest. Based on her actual knowledge of these facts, the trial court found that she had a duty to investigate the status of her shares.

¶ 21 In addition, Mr. Macris's knowledge surrounding the stock transfer to SSI is imputed to Ms. Macris because of their agency-principal relationship, which the trial court found existed.[6] An agent's knowledge of matters within the scope of his or her authority is imputed to his or her principal, for it is presumed that such knowledge will be disclosed to the principal. *See FMA Fin. Corp. v. Hansen Dairy, Inc.,* 617 P.2d 327, 329–30 (Utah 1980) (holding that when all transactions are accomplished through an agent, the agent's knowledge of the transaction is imputed to the principal). If there was an agency relationship, Mr. Macris's knowledge concerning the transfer and subsequent cancellation of the shares by SSI and SSI's refusal to open its books to Mr. Macris's accountant is imputed to Ms. Macris.

¶ 22 In *Capitol Electric Co. v. Campbell,* 117 Utah 454, 217 P.2d 392 (1950), we addressed the issue of when a spouse can be considered to have implied authority as an agent for the other spouse. In that case we agreed with an Oklahoma court that " '[w]hile the husband's authority to act for his wife is not implied from the marital relation, nor from the mere fact that he occupied, or managed and controlled, his wife's property, yet in many instances the agency of the husband is inferred from the circumstances ....' " *Capitol Electric,* 117 Utah at 459, 217 P.2d at 394 (quoting *Caldwell v. Overall,* 186 Okla. 615, 99 P.2d 496 (1940)). We then stated that "some fact or circumstance is required in addition to the marital relation and management of the wife's property by the husband before an agency of the husband will be inferred." *Id.*

¶ 23 The finding of an agency relationship between the Macrises is supported by facts and circumstances beyond their marital relationship. Mr. Macris handled the business interests of the marriage, and particularly the business relationship between the Macrises and SSI. Ms. Macris testified that her husband had authority to negotiate the buyout agreements. There is no evidence Ms. Macris took an active role in managing her ownership interest or in monitoring her investment. She cannot now disavow knowledge of the events surrounding the cancellation of her shares simply because her husband handled her business for her. *See Merchants Nat'l Bank & Trust Co. v. H.L.C. Enters., Inc.,* 441 N.E.2d 509, 514 (Ind.Ct. App.1982) (holding that notice of the financial condition of the corporation was imputed to

ceptional circumstances doctrine should apply, and we therefore discuss the case at bar under that standard.

6. We acknowledge that if Mr. Macris was the agent of his wife, he had the authority to endorse the stock certificates and there was no conver-

sion. However, the trial court decided the case on the ground that there was a conversion but that the statute of limitations barred any recovery therefor. Accordingly, we analyze only the conversion theory.

wife as the result of her consistent past behavior of delegating the conduct of their closely held business to her husband). The trial court found that an "agency relationship was based upon their marriage which they describe as a complete partnership and their course of dealings regarding their joint financial and business matters. The Macrises acknowledged that they always held business property as joint tenants and that Mr. Macris was authorized to act for Ms. Macris in handling these business matters." Ms. Macris therefore had imputed knowledge of the facts pertaining to the conversion.

¶ 24 Mr. Macris requested an audit of financial information of SSI. That access was denied in a letter dated April 29, 1988, giving the Macrises further notice that Metos was acting adversely to their alleged interest in SSI. Mr. Macris believed he had a claim against Metos and SSI at that time. Specifically, Mr. Macris testified that when he learned Metos would not allow his accountant to review the company's financial records, he was angry and considered initiating a lawsuit. Metos also testified that his response to Mr. Macris's request angered Mr. Macris. The letter and the accountant's limited access to the books made it clear that Metos believed the Macrises were entitled only to information on royalty income under the Purchase Agreement and had no right as shareholders to information regarding the financial condition of SSI. Ms. Macris was therefore on notice of the conversion in 1988 within the three-year limitation period that began to run in 1986 when the stock certificates were canceled.

¶ 25 Ms. Macris argues that SSI's refusal to allow the Macrises access to company information cannot be construed as notice of the facts underlying her claim because the request was made under the Consulting Agreement, not the Purchase Agreement. She contends that if the request was made under the Consulting Agreement, SSI's refusal to give the Macrises access to the records did not give her notice of conversion. The trial court, however, found that the request was not made under the Consulting Agreement because those monies had been paid in full by May 1986, two years before the request to inspect SSI's books. Additionally, the Consulting Agreement does not provide the Macrises any right to review bank statements, income tax returns, or the particular financial statements the Macrises sought to access. Consequently, the court found, and we agree, that the audit request was made either as a shareholder or to determine whether the back-end royalties contemplated in the Purchase Agreement had been appropriately paid. Therefore, Mr. Macris was effectively put on notice of the conversion when he was denied access to the records as a shareholder or under the Purchase Agreement and that knowledge, if not actually possessed by Ms. Macris, is imputed to her.

¶ 26 Moreover, the lack of cooperation of SSI put Ms. Macris on inquiry notice of her claim of conversion. On this point, a similar factual situation arose in *Anderson v. Dean Witter Reynolds, Inc.*, 920 P.2d 575 (Utah Ct.App.1996), where the plaintiff's son, who was the trustee of the plaintiff's marital trust after her husband died, told her in 1984 that market conditions had depleted her funds. What the plaintiff did not know until six years later was that, contrary to the express provisions of the trust documents, her son had transferred her funds into margin accounts and had borrowed against the funds, exhausting the corpus by 1984. Nonetheless, the court found that her knowledge of the depletion of the funds put her on inquiry notice that the defendant brokerage and her son had violated the trust agreement. Because she failed to investigate the facts surrounding her loss, the statute of limitations was not tolled. *Id.* at 578.

¶ 27 Likewise, in the case at bar, Ms. Macris knew the key facts, which put her on notice that her alleged interest in SSI was in question. We conclude that like the plaintiff in *Anderson*, Ms. Macris had the duty to be reasonably diligent in investigating SSI's refusal to provide access and information once she had notice of the refusal. *Walker Drug Co. v. La Sal Oil Co.*, 902 P.2d 1229 (Utah 1995) (holding that plaintiffs failed initial burden of showing they could not have known of property damage when they were aware of governmental investigation of potential con-

tamination); *see also Becton Dickinson & Co. v. Reese,* 668 P.2d 1254 (Utah 1983) (holding that due diligence was required of plaintiff alleging conversion of his invention when he knew a patent had issued on the invention). Ms. Macris has not shown she "did not know of and could not reasonably have known of the existence of the cause of action in time to file a claim within the limitation period." *Warren,* 838 P.2d at 1129. The evidence supports the trial court's finding that Ms. Macris knew or should have known that she had a claim against Metos and SSI in 1988 based on the same facts on which this action was filed in 1995. Because she failed to pursue it once she was put on inquiry notice, Ms. Macris's conversion claim was barred when filed.

██ ¶ 28 Even assuming, arguendo, that the threshold test for exceptional circumstances is met in that Ms. Macris did not and could not reasonably have known of the existence of her cause of action, we conclude that the statute of limitations should not be tolled because application of the limitation is not irrational or unjust. Evidence of an unjust or irrational application of the statute of limitations would necessarily be based primarily on the Macrises' testimony. The trial court made lengthy findings of fact on the credibility of the witnesses that would not support the conclusion that the limitation period should be tolled on either basis. Specifically, the court found that Metos was consistently more credible than the Macrises. Metos conceded facts that were contrary to his interest as opposed to Mr. Macris who did not willingly concede an adverse fact, but had "ready explanations for all the contrary evidence. The explanations were frequently not credible." The court disbelieved Mr. Macris's explanation of why he testified in prior litigation that he had sold his interest in SSI. The trial court also found "incredible" Ms. Macris's testimony that she understood she would have an opportunity to endorse the stock certificates after their delivery to SSI's attorney.

## II.  LAW OF THE CASE

██ ¶ 29 Ms. Macris contends that the law of the case doctrine precluded Judge Quinn from reaching a result contrary to Judge Stirba's conclusion on summary judgment that her claim was not barred by the statute of limitations. "One branch of the doctrine stands for the general rule that 'one district court judge cannot overrule another district court judge of equal authority.'" *AMS Salt Indus. v. Magnesium Corp.,* 942 P.2d 315, 319 (Utah 1997) (quoting *Mascaro v. Davis,* 741 P.2d 938, 946 (Utah 1987)); *see also Thurston v. Box Elder County,* 892 P.2d 1034, 1037 n. 2 (Utah 1995) (describing other applications of law of the case doctrine). However, the law of the case doctrine does not prevent a judge from reconsidering his or her previous nonfinal orders. *Plumb v. State,* 809 P.2d 734, 739 (Utah 1990). Rule 54(b) of the Utah Rules of Civil Procedure specifically contemplates reconsideration by the court prior to entry of a final judgment on all claims:

> [A]ny order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is *subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

(Emphasis added.) Judge Stirba had not adjudicated "all the claims and rights of the parties" in her summary judgment ruling in favor of Ms. Macris. Judge Quinn was therefore working within the parameters of his authority to reevaluate and ultimately reach a conclusion contrary to that earlier made by Judge Stirba.

¶ 30 Judge Quinn's conclusion should be seen not as a ruling by a co-equal court, but rather as the same judicial officer reconsidering a prior ruling under rule 54(b) when Judge Stirba took leave. *See Gillmor v. Wright,* 850 P.2d 431, 438–39 (Utah 1993) (Orme, J., concurring); *see also Interlake Distributors, Inc. v. Old Mill Towne,* 954 P.2d 1295, 1298 (Utah Ct.App.1998) (noting that second judge on the case replaced the first judge and thus became the same judicial officer; thus different judge could "overrule" prior judge's decision to deny attorney fees).

Just as Judge Stirba could have corrected her prior ruling at trial had she been convinced that she was wrong, Judge Quinn could treat this case as "his" case and correct the trial court's mistake as the evidence in the three-day trial exposed the error of the prior ruling.

¶ 31 Judgment affirmed.

¶ 32 Associate Chief Justice RUSSON, Justice DURHAM, Justice WILKINS, and Judge THORNE concur in Chief Justice HOWE'S opinion.

¶ 33 Having disqualified himself, Justice DURRANT does not participate herein; Utah Court of Appeals Judge WILLIAM A. THORNE sat.