*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 34**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

BUILD, INC.,
*Appellant,*

*v.*

UTAH DEPARTMENT OF TRANSPORTATION, CLYDE-GENEVA
CONSTRUCTORS, W.W. CLYDE & CO., and GENEVA ROCK PRODUCTS,
INC.,
*Appellees.*

No. 20151058
Filed July 17, 2018

On Appeal of Interlocutory Order

Third District, Salt Lake
The Honorable Ryan M. Harris
No. 090904101

Attorneys:

Michael D. Zimmerman, Troy L. Booher, Beth E. Kennedy,
Clark B. Fetzer, Salt Lake City, Kim J. Trout, Boise, ID, for appellant

Stanford P. Fitts, Stephen J. Trayner, S. Spencer Brown, Jessica J.
Johnston, Salt Lake City, for appellee Utah Department of
Transportation

Robert F. Babcock, Brian J. Babcock, Cody W. Wilson, Salt Lake City,
for appellees Clyde-Geneva Constructors, W.W. Clyde & Co., and
Geneva Rock Products, Inc.

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and
JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Build, Inc. was hired by the Utah Department of
Transportation (UDOT) to work on three different construction

projects. Build encountered problems on all three projects, and it filed various claims against UDOT and three other contractors on the project.[1] UDOT moved for summary judgment on two sets of claims—claims for breach of contract on the "Arcadia" project and claims seeking consequential damages.[2] The original judge assigned to the case, Judge Kennedy, denied both motions.

¶2   After his retirement Judge Kennedy was replaced by Judge Harris. Judge Harris ultimately dismissed Build's claims for breach of contract and consequential damages. And Build challenges both dismissals on this interlocutory appeal.

¶3   Build challenges the dismissal of the Arcadia claim on two grounds. It contends (a) that Judge Harris violated a so-called coordinate judge rule, which in Build's view limits the discretion of a successor judge to revisit decisions of a predecessor; and (b) that Build presented sufficient evidence to defeat UDOT's motion on its merits. Build also challenges the dismissal of its claim for consequential damages. It asserts that Judge Harris erred in dismissing this claim without full briefing on a motion for summary judgment and that he incorrectly concluded that Build lacked proof of its consequential damages.

¶4   We affirm. Judge Harris had the authority to dismiss both claims, and he committed no reversible error by doing so. In so holding, we repudiate any language in our precedent that suggests that a successor judge on a case is bound by nonfinal decisions and rulings made by his predecessor. We clarify that different judges on the same case are considered a single judicial officer—and thus that a successor judge has the same power to review nonfinal decisions that a predecessor would have had.

## I. BACKGROUND

¶5   UDOT hired Build to work as a contractor on three different construction projects: the Legacy project, the Arcadia project, and the I-215 project. Only the facts surrounding the Arcadia project are

---

[1] These parties are Clyde-Geneva Constructors, W.W. Clyde & Co., and Geneva Rock Products (collectively "Clyde-Geneva").

[2] Though we refer throughout to all the appellees collectively as "UDOT," Clyde-Geneva was not a party to the Arcadia project and joins the appeal only as to the consequential damages claim.

relevant to this appeal, however, so we discuss only that project here.

¶6    The Arcadia project involved the replacement of a bridge and reconstruction of the highway on either side of it. This required excavation, and the excavated soil was slated to be disposed as "fill" around the boundaries of the project. After excavation began, UDOT's engineer, Rex Harrison, discovered a complication that prevented this method of soil disposal. So Build disposed of the soil offsite, incurring $389,000 of additional costs.

¶7    Build requested that UDOT compensate it for this additional work. UDOT refused. Build then experienced financial problems and went out of business. It filed suit against UDOT, asserting that UDOT had breached its contract by asking Build to complete work that fell outside of the contract and then refusing to compensate Build for that work. Build also alleged that UDOT's failure to appropriately compensate Build for this extra work led to lost capital and cash flow, lost bonding capacity, and eventually the demise of its business. Build sought damages for breach of contract. It also requested consequential damages associated with the loss of its business.

¶8    The agreement between these parties contains two provisions dealing with changes to the contract; the viability of Build's claim for breach depends on which of the two applies here. One provision, found in Part 1.6, deals with changes that the engineer recognizes as falling outside of the contract. It allows UDOT to make intentional changes to the project if it does so in writing. Build's breach of contract claim invoked this provision of the contract. It asserted that UDOT had recognized that the additional soil disposal was outside of the contract's parameters, and claimed that UDOT had breached Part 1.6 by failing to give notice in writing and to compensate Build for this change.

¶9    UDOT denied that Part 1.6 applied and claimed instead that Part 1.5 of the contract controlled. That provision governs if Build believes there has been a change in the contract that UDOT does not recognize. In that case, Build must give UDOT notice of the "alleged change" in writing within five days of the date a change is noted.

¶10   The contract also provides that "[f]ailure to provide the required notice constitutes a waiver of any and all claims that may arise as a result of the alleged breach." It is undisputed that Build failed to provide the notice required by Part 1.5. And UDOT asserted that Build had waived its claim to additional compensation by

failing to provide this notice. It moved for summary judgment on that basis.

¶11 UDOT also moved for summary judgment on the consequential damages issue. It argued that Build had "failed to provide any evidence as to the value of [its] business before and after UDOT's alleged conduct." UDOT acknowledged that Build had designated an expert (Joan Whitacre). But it noted that Ms. Whitacre had failed to specify an amount of consequential damages or to identify a methodology for calculating such damages.

¶12 The summary judgment motion on the breach of contract claim was submitted to Judge Kennedy for decision. He denied the motion on all counts. In denying the motion Judge Kennedy ruled that Build's claims were "subject to questions of fact, including whether UDOT breached its contract with [Build], whether UDOT waived the notice provision and whether [Build's] claims satisfy the requirement of the Changed Conditions Clause of the contract specifications."

¶13 Judge Kennedy also upheld the viability of Build's consequential damages claim. He concluded that Build had "presented evidence—most notably in the form of Joan Whitacre's expert opinion—that supports its consequential damages claim."

¶14 Judge Kennedy retired soon after issuing his decision denying UDOT's motions. He was replaced in this case by Judge Harris. By that time the dispositive motion deadline had long since passed. Yet UDOT filed two new motions. The first, styled as a motion for clarification, related to the Arcadia claim. In that motion, UDOT claimed that Judge Kennedy should have applied *Meadow Valley Contractors, Inc. v. State Department of Transportation*—a decision addressing contract provisions virtually identical to Parts 1.5 and 1.6 of the contract between Build and UDOT. 2011 UT 35, 266 P.3d 671, *abrogated on other grounds by Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, __ P.3d __. The *Meadow Valley* court determined that contractual language mirroring Part 1.6 applied only where the engineer "knowingly and deliberately" made changes to the contract. *Id.* ¶ 31. And in the absence of a showing of knowledge or deliberate action, it held that any alteration to the contract would have to be considered an "alleged change"—triggering the language in the contract mirroring Part 1.5, with its requirement that the contractor provide notice of the alleged change or else forfeit its right to compensation. *Id.* ¶ 33.

¶15 Judge Harris agreed with UDOT that *Meadow Valley* controlled. He held that Build had failed to provide any evidence that the change was "knowing and deliberate" on Harrison's part, and that Part 1.5 accordingly applied. And because Build had failed to comply with the notification requirements of that Part, Judge Harris concluded that Build had waived its claim for additional compensation. He accordingly entered summary judgment against Build on the Arcadia claim.

¶16 UDOT's second motion was styled as a motion *in limine*. This motion asked the court to exclude the testimony of Joan Whitacre and Build's president Freddie Stromness on the amount of Build's consequential damages. In so moving UDOT pointed out that Build had never provided a calculation of its consequential damages. And it asserted that Whitacre and Stromness should be prohibited from testifying as to that amount on that basis.

¶17 At the hearing on the motion Judge Harris noted that a decision granting UDOT's motion *in limine* would "fatally wound" the business devastation basis of the consequential damages claim. And he ultimately granted the motion. In so doing he also entered an order dismissing the consequential damages claim outright, concluding that the claim "fails for lack of proof" because Whitacre and Stromness were barred from testifying on the issue.

¶18 Build petitioned for leave to file this interlocutory appeal. We granted the petition, and review the dismissal of Build's claims *de novo*, affording no deference to the district court's analysis. We do so because the district court's decision amounted to a summary dismissal of Build's claims,[3] and summary judgment is subject to *de novo* review. *See Dillon v. S. Mgmt. Corp. Ret. Tr.*, 2014 UT 14, ¶ 21, 326 P.3d 656.

¶19 We consider Build's challenges to the dismissal of the Arcadia claim first, in Part II below. Then we address Build's

---

[3] UDOT's motion for clarification on the Arcadia claim was effectively a motion to reconsider summary judgment. *Infra* ¶ 20 n.4. And that makes Judge Harris's dismissal of the breach of contract claim in substance a grant of UDOT's original summary judgment motion. The procedural basis for Judge Harris's dismissal of the consequential damages claim is less clear. *Infra* ¶ 43. That said, because it has the effect of a grant of summary judgment, we treat it that way for the purposes of our standard of review.

arguments regarding the consequential damages claim, in Part III. We affirm on all counts, and in so doing reinforce the authority of a successor judge (here, Judge Harris) to make any decisions that could be made by a predecessor (Judge Kennedy).

## II. DISMISSAL OF THE ARCADIA CLAIM

¶20 Build challenges the dismissal of the Arcadia claim on two grounds. First it says that Judge Harris lacked the authority to reconsider a motion previously denied by Judge Kennedy, citing a so-called coordinate judge rule in our cases. And second, even assuming that Judge Harris had the authority to decide the issue, Build claims that he erred in granting summary judgment.[4] We disagree on both counts and affirm.

## A. The "Coordinate Judge Rule"

¶21 A line of our cases refers to a set of limits on the authority of a successor judge to reconsider decisions of a predecessor. The first of these cases is *Richardson v. Grand Central Corp.*, 572 P.2d 395 (Utah 1977). In *Richardson* we stated that "ordinarily one judge of the same court cannot properly overrule the decision of another judge of that court." *Id.* at 397. We connected this principle to the doctrine of the "law of the case."[5] *Id.* And we made reference to an exception to this

---

[4] Build also makes a third argument. It says that UDOT's motion for clarification may properly be viewed as a new motion for summary judgment. And it asserts that Judge Harris erred in granting the motion because the dispositive motion deadline had passed. We reject this argument, however, because we disagree with its premise. The motion, in substance, was not a new motion but a motion to reconsider. And although Judge Harris was not required to rule on such a motion, he had the discretion to do so. *A.S. v. R.S.*, 2017 UT 77, ¶ 28, 416 P.3d 465 ("[T]rial courts are under no obligation to consider motions for reconsideration and any decision to address or not to address the merits of such a motion is highly discretionary." (citation omitted) (internal quotation marks omitted)). His decision on such a motion, moreover, obviates the need for us to decide whether it would be error for a court to rule on a new motion after the dispositive motion deadline has passed without an extension of the deadline.

[5] "Under the law of the case doctrine, a court [may] decline to revisit issues within the same case once the court has ruled on

general rule—to the notion that "the ruling of one judge as to the sufficiency or effect of pleadings, does not prevent another division of the court from considering the same question of law if it is properly involved on a subsequent motion which presents the case in a different light." *Id.*

¶22 We reinforced the premises of the *Richardson* case in our subsequent decision in *Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735 (Utah 1984). *Sittner* makes express reference to a set of rules governing a "coordinate judge." *Id.* at 736. It also reiterates the notion that a successor judge may overrule a previous judge's decision where the issues are presented in a "different light"—a matter that *Sittner* refers to as one of "several exceptions" to the general rule. *Id.*

¶23 The *Sittner* framework has been invoked in several of our subsequent cases.[6] More recently, in *Red Flame, Inc. v. Martinez*, we recognized a new exception to the *Sittner* rule—an exception upholding a successor judge's authority to revisit a previous judge's decision where "it appears to the second judge that the first ruling was clearly erroneous and will infect the subsequent proceedings with error." 2000 UT 22, ¶ 5, 996 P.2d 540 (citation omitted).

¶24 Build challenges Judge Harris's decision under this line of cases. Build says that Judge Kennedy's decision denying UDOT's motion for summary judgment motion was not "clearly erroneous" and insists that the matter was not presented to Judge Harris in a "different light." And for these reasons Build claims that Judge Harris was foreclosed from revisiting Judge Kennedy's earlier summary judgment decision—notwithstanding his determination that the Arcadia claim was destined for failure at trial.

---

them." *McLaughlin v. Schenk*, 2013 UT 20, ¶ 22, 299 P.3d 1139 (alteration in original) (citation omitted) (internal quotation marks omitted).

[6] *See, e.g.*, *Mascaro v. Davis*, 741 P.2d 938, 946–47 (Utah 1987) (reversing decision by successor judge reconsidering the decision of a predecessor); *State v. Lamper*, 779 P.2d 1125, 1129 (Utah 1989) (finding that a successor judge erred in not revisiting a ruling after a change in the law); *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 319 (Utah 1997) (affirming a successor judge's reversal of a prior judge because of the "additional evidence . . . adduced" (omission in original) (citations omitted)).

¶25 We concede that the above cases yield a plausible basis for Build's position. The cited cases admittedly can be read to establish a limitation on the authority of a successor judge to revisit decisions of a predecessor. But that view of these cases is at odds with a different line of authority in our law—a set of rules and cases that establishes that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be changed at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." UTAH R. CIV. P. 54(b); *see also Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶¶ 29–30, 24 P.3d 984 (holding that "the law of the case doctrine does not prevent a judge from reconsidering his or her previous nonfinal orders" and extending this principle to a successor judge, who is not treated as a different judge, "but rather as the same judicial officer reconsidering a prior ruling" (citations omitted)); *Mid-Am. Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶¶ 11, 14, 216 P.3d 352 (explaining that the law of the case doctrine preserves a judge's discretion to revisit a prior ruling and holding that this rule applies "regardless of whether the judge has changed or remained the same throughout the proceedings"); *McLaughlin v. Schenk*, 2013 UT 20, ¶¶ 22–24, 299 P.3d 1139 (same).

¶26 Our "law of the case" precedent is thus in a state of internal conflict. On one hand we have purported to limit the authority of a successor judge to revisit the decisions of a predecessor. But on the other we have recognized the broad discretion of any judge (even a successor) to revisit prior rulings. These two lines of authority stand in inevitable conflict with each other. And the time has accordingly come for us to reconcile them.

¶27 We do so by adopting a limiting construction of the *Sittner* line of cases. On reflection, we view the principles stated in those cases as hortatory—expressing best-practice considerations for successor judges, and not limitations to be enforced by a reviewing court on appeal. Thus, we reinforce the broad discretion of any judge (whether initially assigned to the case or stepping in as a successor to another) to revisit any nonfinal decision entered previously. And we frame the considerations set forth in the *Sittner* line of cases as mere

factors that successor judges may wish to take into account in exercising their broad discretion in this area.[7]

¶28 We cannot take the *Sittner* line of cases at face value. To do so would introduce an operational inefficiency into our system.[8] If a successor judge is convinced that a predecessor made an error in entering a nonfinal order, it makes no sense to require the successor judge to reinforce that order at all costs. The successor judge should retain the discretion to overturn the prior decision—whether or not it is presented in a "different light," and whether or not it is "clearly erroneous." At least sometimes it will make sense for the successor judge to step in and correct what he perceives as an error in an earlier order even when the case is presented in the same light, and even when the error is less than clear.

¶29 This case is a good example. The successor judge in this case became convinced that his predecessor had erred in denying UDOT's motion for summary judgment. And if he was right in that assessment (a question we turn to below), it would make no sense to require him to let the case go to trial. Such a requirement—under a strict reading of the *Sittner* line of cases—would direct the successor judge to subject the parties to a trial that the judge knows to be pointless (because it would inevitably result in the entry of judgment as a matter of law[9]). That makes no sense as a practical matter. And

---

[7] This formulation is consistent with a premise of our opinion in *Red Flame, Inc. v. Martinez*—that "[i]t is not that the second judge lacks power to revisit an earlier judge's rulings," but rather that "there are circumstances where that power should not be exercised." 2000 UT 22, ¶ 4, 996 P.2d 540 (citation omitted).

[8] *See Richardson v. Grand Cent. Corp.*, 572 P.2d 395, 397 (Utah 1977) (recognizing that the law of the case doctrine promotes judicial economy because it aids in "avoid[ing] the delays and the difficulties involved in repetitious contentions and rulings upon the same proposition in the same case").

[9] *See Salo v. Tyler,* 2018 UT 7, ¶ 31, 417 P.3d 581 ("The summary judgment standard anticipates—and mirrors—the directed verdict inquiry. If a defendant can show that the plaintiff has no legally sufficient evidentiary basis for its claims at trial, the defendant may establish the lack of a genuine issue of material fact and an entitlement to judgment as a matter of law.").

presumably that is why our more recent cases yield to all judges the authority to revisit prior nonfinal decisions.

¶30 This is not to say that the decision to revisit a prior order should be made willy-nilly. We still see wisdom in the cautionary standards set forth in the *Sittner* line of cases. A successor judge should tread lightly before jumping to the conclusion that his perspective on the case is superior. He should measure twice before cutting down the decision of a predecessor. That is how we take the standards set forth in our *Sittner* cases. They articulate principles that the careful successor judge would be wise to account for. Before overruling a predecessor the successor judge should ask whether his perspective of the case is different from—or better than—that of the judge whose decision he is about to strike down. And he should pause before concluding that the prior judge's ruling (and not his own) is clearly in error.[10]

¶31 That decision, however, is for the successor judge, not for a reviewing court on appeal. The successor judge, after all, *is* the court whose decision is being reviewed on appeal. He is the "same judicial officer" as the judge whose decision he overturned. *Macris*, 2001 UT 43, ¶ 30. The fiction on appeal, in other words, is that there is no such thing as a predecessor or successor—just the district court.

¶32 We reject Build's threshold argument on this basis. We conclude that Judge Harris had the authority to overturn the decision of Judge Kennedy denying UDOT's motion for summary judgment. And we reframe our case law in this field to clarify that the limitations on successor judges are hortatory considerations for trial judges, not enforceable standards to be applied on appeal.

---

[10] Not every prior decision, moreover, is worth a probing second look. Some nonfinal decisions represent the exercise of classic judicial discretion. Others will have little effect on further proceedings in the case. Those sorts of decisions probably should be left alone, as any attempt to revisit them seems likely to introduce unnecessary delay and inefficiency in the disposition of the case. But the decision at issue here is different. It involved the denial of a dispositive motion for summary judgment. And the perception of error on that kind of decision could predictably cut the other way on delay and inefficiency, as noted above. *See supra* ¶¶ 28–29.

### B. Merits of the Summary Dismissal of the Arcadia Claim

¶33 That leads us to the merits of Judge Harris's decision on summary judgment. Build asserts that there was a dispute of material fact as to whether Build had waived its claim to compensation for its extra work under the terms of the parties' contract. And it asks us to reverse on that basis.

¶34 The issue on summary judgment is whether the UDOT engineer (Harrison) understood that he was ordering extra work. His understanding and intention control whether Part 1.5 or Part 1.6 applies, which is the dispositive question in this case. If Harrison believed that he was ordering work that was outside the scope of the contract, then Part 1.6 of the contract applies. That provision requires UDOT to make the changes in writing. Because UDOT did not fulfill this requirement under Part 1.6, it would be liable if this provision applied. But if Harrison did not believe he was ordering extra work, Part 1.5 applies. That provision gives Build five days to give written notice of the "alleged change" to UDOT, or else it "waives[s] . . . any and all claims that may arise as a result of the alleged change." Build did not give the required notice of the "alleged change" to UDOT within five days. So Build is left without recourse if Part 1.5 controls.

¶35 To escape Part 1.5, Build must show that Harrison "knowingly and deliberately" made changes to the contract or "believed" that the change "altered the contract." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 32, 266 P.3d 671, *abrogated on other grounds by Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon,* 2018 UT 23, __ P.3d __. This standard requires proof that Harrison subjectively believed that he was seeking a change that altered the contract. Yet Harrison testified to the contrary. He stated in a declaration submitted in response to Build's motion for summary judgment that he "did not consider Build's hauling of the extra material from the project site to the County dump to constitute change involving extra work as there was no change of contract plans or specification by actions they were undertaking."

¶36 This statement, if unrebutted, is enough to sustain UDOT's motion for summary judgment. Build seeks to overcome it by pointing to material in the record that in its view establishes a genuine issue of material fact about Harrison's belief. But none of Build's points is persuasive.

¶37 Build first cites to language in the contract—to a provision stating that "fill slopes may be flattened as shown on plans in order

to waste excess material," and to another clause indicating how much excavated material would be disposed of at various locations within the project site. But these provisions don't rebut Harrison's testimony of his subjective belief. At most they go to the question whether Harrison's belief was based on a reasonable interpretation of the contract. But again the question is not whether his belief was reasonable; just whether he in fact held that belief. And these pieces of evidence accordingly give no traction to Build's case.

¶38 Build next points to testimony from Harrison. It notes that Harrison stated that "the contractor was allowed to dispose of excavated material in waste areas" within the project site. In Build's view this means that Harrison understood offsite areas to be *excluded* by the contract. But we do not read this permissive statement as exclusive. And we reiterate, as with the contract provisions, that Build's evidence does not contradict Harrison's stated belief that no extra-contractual work was required.

¶39 Build also cites to Harrison's statement that he instructed Build to haul the excess clay offsite based on an exercise of his "personal engineering judgment." Here the implication is that Harrison's "personal engineering judgment" stands in contrast to the contractual arrangement. We are not sure that that follows. But even if we accepted Build's chain of inferences, we would revert back to the point that this evidence again does not contradict Harrison's stated subjective belief.

¶40 The next arrow in Build's quiver is a letter from Harrison to Build stating that a "changed condition is acknowledged as the basis of [Build's] claim, in that . . . [excavated material] could no longer be effectively disposed of within the contract limits." But there are two problems with this letter. First is the fact that this statement seems to be nothing more than an acknowledgment and restatement of Build's position. Second, even if this were a concession, it would reflect UDOT's and Harrison's belief in 2008 when the letter was written. Again this does not contradict Harrison's statement about his belief at the time these events occurred in 2006.

¶41 Build's final move is to cite a change order from UDOT indicating that part of the project "is constructed on an unstable historic land slide" and detailing the "corrective action" taken to "improve its stability per Geotechnical Engineers['] recommendations." Like the letter from Harrison, however, this change order came long after the fact, in 2007. Even if we read this as a flat concession by UDOT—which we do not—it doesn't directly

contradict Harrison's direct evidence of his subjective belief at the time the events occurred. Again, this evidence might be probative as to the reasonability of Harrison's belief at the time. But that question is irrelevant. The issue is whether Harrison "knowingly and deliberately" made changes to the contract. And the change order does not go to that issue.

¶42 UDOT has proffered direct evidence of Harrison's subjective belief at the time of the "alleged change," including by Harrison's own testimony. Nothing Build provides directly contradicts this evidence. Much of Build's evidence goes to the reasonableness of Harrison's belief; some of it at best reflects Harrison's understanding long after the fact. It would not be reasonable for a jury to infer from this evidence that Harrison believed he was changing the contract. We affirm Judge Harris's dismissal of the breach of contract claim on this basis.

### III. DISMISSAL OF THE CONSEQUENTIAL DAMAGES CLAIM

¶43 Build also appeals the district court's decision to dismiss its claim for consequential damages. The court dismissed these claims as a natural result of its decision granting UDOT's motion *in limine*. The decision on the motion *in limine* excluded Build's two witnesses on consequential damages, Stromness and Whitacre. Without those witnesses, the district court determined that Build's consequential damages claim was baseless. And it dismissed the claim on that basis.

¶44 Build challenges this decision on two fronts. It first says that the court erred in dismissing the consequential damages claim without the benefit of full briefing on a motion for summary judgment on the matter. Alternatively, Build challenges the district court's decision on its merits—asserting that it presented sufficient evidence in support of its claim *beyond* the excluded testimony of Stromness and Whitacre.

¶45 Build's first point may have merit. It may have been preferable for the district court to order briefing on the question whether the decision granting the motion *in limine* should lead to the summary dismissal of the consequential damages claim. No summary judgment motion was pending, after all. And a summary dismissal of a claim is a more substantial step than a mere decision to exclude testimony or evidence.

¶46 We need not reach the question whether this amounted to reversible error, however. The district court retained the discretion to extend the dispositive motion deadline and to order the parties to

brief a new motion for summary judgment on the consequential damages claim.[11] And we conclude that any alleged error in the failure to do so was harmless.

¶47 The record shows quite clearly that Build could not have proven its consequential damages claim without the testimony of Stromness and Whitacre. Because Build never disclosed a calculation method or the amount of consequential damages it was claiming, moreover, any additional evidence it might have proffered likely could have been properly excluded under civil rule 26(d)(4). UTAH R. CIV. P. 26(d)(4) ("If a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure."); *id.* 26(a)(1)(C) ("[A] party shall, without waiting for a discovery request, serve on the other parties . . . a computation of any damages claimed . . . ."). That renders any arguable error in the failure to order briefing on a motion for summary judgment harmless, as such a motion would surely have been granted on this record.

¶48 Build had a series of opportunities to present evidence in support of its consequential damages claim. It repeatedly failed to do so. This series of failures culminated in the decision granting the motion *in limine*. And that decision would inevitably have led to the dismissal of the consequential damages claim even if the propriety of such dismissal had been fully briefed on a motion for summary judgment.

¶49 Build's first chance to proffer evidence to prove its amount of consequential damages came at the earlier summary judgment phase. At that stage the record is clear that Build identified only Whitacre's and Stromness's testimony in support of this claim. In UDOT's original motion for summary judgment on the consequential damages claim, UDOT asserted that "Build ha[d] failed to provide any evidence as to the value of [its] business before and after UDOT's alleged conduct." It also alleged that "Build's consequential damage/business devastation claim is based upon the opinions of Build's expert, Joan Whitacre." When so challenged,

---

[11] *See* UTAH R. CIV. P. 56(b) (noting that a party may file a motion for summary judgment at any time no later than 28 days after the close of all discovery "[u]nless the court orders otherwise").

Build did not directly contradict UDOT's characterization. Instead, Build referred again to Whitacre's testimony and adverted vaguely to generic evidence in the record—such as evidence of "25 years [of] Build's financial records." It thus asserted that it had "placed into the record . . . relevant admissible information from which the jury may determine fair market value before and after UDOT's wrongful conduct." Yet Build's only apparent witness on the matter was Stromness, and Stromness was excluded by the decision granting the motion *in limine*.

¶50 Build had another chance to alert the court to additional evidence in response to UDOT's motion *in limine*. Here UDOT argued that Build's consequential damages claim was based on Whitacre's testimony. Build responded that UDOT's characterization was "incomplete" because its claim was also "based on the facts considered by Ms. Whitacre[,] . . . evidence of Build's financial condition provided in this case[,] . . . and the opinions of Fred Stromness." Again, Build did not point to any witnesses outside of those that the court excluded.

¶51 Build's last chance to proffer additional evidence was at the hearing on the motion *in limine*. There, the following exchange took place:

> *The Court*: [I]t seems to me you have [not given a basis for the computation], by preventing Mr. Stromness, who will be your witness on this; right? You don't have another.
>
> *Mr. Fetzer* [counsel for Build]: We have Ms. Whitacre on the causation and the—the fact and causation of the damages, we have—
>
> *The Court*: Okay. And they're not challenging that, they're not challenging Ms. Whitacre being able to get put on the stand and testify as to causation about business devastation. Who's your guy?
>
> *Mr. Fetzer*: Mr. Stromness.
>
> *The Court*: For the number. Okay.
>
> *Mr. Fetzer*: Mr. Stromness.

Here again Build failed to identify a witness outside of Stromness or Whitacre. Later at that hearing, Judge Harris suggested that he was considering the option of "kick[ing Build's] whole claim for a failure to disclose." He added, "if you think I'm seeing that inappropriately or incorrectly, I'd like to hear from you and like to know what else you think I can do about it." But Build doubled down on Stromness

as its witness. If Build had another witness to rely on for this claim, it did not give so much as a hint to that effect on the record.

¶52  With the above in mind, we find no reversible error in the district court's decision to dismiss the consequential damages claim. Full briefing on the question may have been a best practice. But we find any arguable error in the decision not to order such briefing to be harmless. The record clearly shows that Build relied only on Stromness and Whitacre to support its consequential damages claim at every step of the litigation. And for that reason we think it inevitable that the district court would have dismissed the claim even if it had ordered full briefing on a motion for summary judgment.

¶53 Build suggests that it conceivably could have identified alternative theories of consequential damages. It alludes to the notion of attorney fees as consequential damages in its brief. And it referred to other possible theories at oral argument—including the notion that the district court's failure to order briefing somehow prevented it from developing a record of the basis for its consequential damages claim in the district court. But these arguments likewise fail. The record developed above shows that Build had ample opportunity to present another theory of consequential damages. And in any event it seems clear that any new theory would have been excluded as not having been previously disclosed under Utah Rule of Civil Procedure 26.

¶54  At the hearing on the motion *in limine* the district court had the opportunity to allow Build to supplement its disclosures, re-open discovery, and push the trial back to allow Build to introduce new evidence or theories in support of its claim for consequential damages. But the court declined to do so. In UDOT's words (at the hearing), the court "disallow[ed] them from going back to start over," forcing them to "live with what they've got and have given us so far." That decision was understandable—certainly within the court's ample discretion. And it led to the inevitable decision to dismiss the consequential damages claim for lack of supporting evidence in the record.

¶55 We affirm on this basis. We find no reversible error in the dismissal of the consequential damages claim because Build never disclosed an amount of consequential damages or a basis for calculating it. When the only two witnesses who might have testified to any such amount were excluded, the claim was left without a leg to stand on. And no alternative theory could have rescued that claim

because any such theory also would have been infected by Build's failure to disclose.

## IV. CONCLUSION

¶56 We affirm the dismissal of Build's Arcadia claim despite the limitations stated in our *Sittner* line of cases. We reframe those limitations as hortatory factors for successor judges to consider. And we reinforce the discretion of a successor or coordinate judge to reconsider a predecessor judge's nonfinal rulings. We also affirm the dismissal of both the Arcadia claim and the consequential damages claim on their merits, deeming any arguable error in the dismissal of the latter claim harmless.

———