**2020 UT App 102**

## THE UTAH COURT OF APPEALS

JACQUELINE CALSERT,
Appellant,
*v.*
ESTATE OF MAXIMO VENTURA FLORES,
Appellee.

Opinion
No. 20181061-CA
Filed July 2, 2020

First District Court, Logan Department
The Honorable Thomas Willmore
No. 184100176

Gregory N. Skabelund, Attorney for Appellant

John D. Luthy and Matthew D. Lorz, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1      Jacqueline Calsert cohabited with Maximo Ventura Flores (Ventura) for over twenty years, and soon after Ventura's death she filed a petition asking the district court to recognize an unsolemnized marriage between them. The court dismissed Calsert's petition, ruling that Calsert had not been legally capable of entering into a marriage with Ventura because she had not obtained an order ending her previous marriage until 2018, after Ventura died. Calsert appeals, asserting that she was legally capable of entering into a marriage with Ventura, because the 2018 order was entered nunc pro tunc, retroactively to 1995. We agree with Calsert that the district court should not have dismissed the case, at least not at this procedural stage, and therefore reverse the district court's order of dismissal.

BACKGROUND[1]

¶2 Calsert began cohabiting with Ventura in or about March 1994. At the time, however, Calsert was still legally married to her previous husband (Ex-Husband). In an effort to end her marriage to Ex-Husband, Calsert filed for a divorce in March 1995. A few months later, in or about August 1995, Calsert and Ex-Husband entered into a stipulation resolving their divorce case but, for reasons not clear in this record, no decree of divorce was ever signed, and that divorce case sat dormant, without final resolution, for over two decades. However, both Calsert and Ex-Husband apparently believed that their divorce had been finalized in 1995.

¶3 Meanwhile, in November 1995, Calsert and Ventura— who had been cohabiting for around a year and a half—agreed to "become husband and wife." They continued cohabiting until Ventura's death in 2017. According to Calsert, over the years she and Ventura came to own joint property and accounts, and held themselves out as husband and wife in their community. And according to sworn declarations from friends and community members, Calsert and Ventura were reputed in the community to be husband and wife.

¶4 At some point, Calsert apparently became aware that her divorce from Ex-Husband had never been finalized, and took two actions—some thirteen years apart—in an effort to remedy the situation. First, in 2005, Calsert filed a second and separate divorce petition, again seeking divorce from Ex-Husband but, for reasons not clear from this record, that divorce case was

---

1. "When determining whether a [district] court properly granted a motion to dismiss, we accept the factual allegations in the complaint as true and consider them, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party." *Krouse v. Bower*, 2001 UT 28, ¶ 2, 20 P.3d 895. We recite the facts with this standard in mind.

dismissed later that year. Second, in 2018—after Ventura's death in late 2017—Calsert filed a motion to reopen the still-dormant 1995 divorce case, and asked the court in that case to enter a divorce decree, retroactive to 1995, finalizing the divorce between Calsert and Ex-Husband. The court granted that motion and entered Calsert's requested order, rendering Calsert and Ex-Husband divorced; the decree stated that "[t]his Decree of Divorce and Judgment shall be effective and in full force nunc pro tunc retroactively to August 22, 1995." That nunc pro tunc[2] decree of divorce (the NPT Decree) was entered in April 2018.

¶5 Ventura died in December 2017, and Calsert was listed as Ventura's spouse on his death certificate. However, Calsert was not appointed personal representative of Ventura's estate (the Estate). A few months later, Calsert filed a petition seeking recognition of an unsolemnized marriage[3] between herself and Ventura, dating back to March 1994, and provided a copy of that petition to attorneys representing the Estate.

¶6 The Estate responded to Calsert's petition by filing a motion to dismiss, pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, asserting that Calsert's petition failed to state a valid claim for recognition of an unsolemnized marriage. Specifically, the Estate asserted that, because Calsert had been

---

2. "Nunc pro tunc" is a Latin phrase meaning "now for then," and is a way of referring to a court's "inherent power" to give an order or judgment "retroactive legal effect." *See Nunc Pro Tunc*, Black's Law Dictionary (11th ed. 2019).

3. We recognize that such marriages are often—and not just colloquially—referred to as "common-law marriages," *see generally*, *e.g.*, *Volk v. Vecchi*, 2020 UT App 77, even though in Utah they are creatures of statute rather than common law, *see* Utah Code Ann. § 30-1-4.5 (LexisNexis 2019). In this opinion, given their statutory origin, we generally refer to such marriages as "unsolemnized marriages."

legally married to Ex-Husband during the entire time she had been living with Ventura, she was not "legally capable of entering a solemnized marriage" with Ventura, as required by statute. *See* Utah Code Ann. § 30-1-4.5(1)(b) (LexisNexis 2019). The Estate also argued that, because Calsert's petition alleged that she had begun cohabiting with Ventura in 1994, and was not divorced—even nunc pro tunc—until 1995, the NPT Decree was of no help to her.

¶7     Calsert opposed the Estate's motion, asserting that, due to the NPT Decree, she was legally capable, as of August 1995, of entering into a marriage with Ventura. In addition, Calsert asserted that she could meet all of the other statutory requirements for recognition of an unsolemnized marriage, and supported that contention with nineteen sworn declarations. And, to the extent that the date of first cohabitation would be a problem for her, Calsert asked for permission to amend her petition to seek recognition of an unsolemnized marriage beginning in November 1995 (instead of March 1994).

¶8     After holding a hearing, the district court granted the Estate's motion to dismiss. In its decision, the court took judicial notice of the docket entries from the 1995 and 2005 divorce cases Calsert filed. The court then proceeded to "find[]" that the nunc pro tunc provision of the NPT Decree—entered by a different judge in a different case—"is invalid and not enforceable." The court expressed its view that the facts of this situation did not lend themselves to the entry of a nunc pro tunc order, and declared that Calsert had "failed to provide" certain information to the judge in the 1995 divorce case, which information "would have prevented the [NPT Decree] from being retroactive." Thus freed from the constraints of the nunc pro tunc provision of the other judge's NPT Decree, the district court concluded that Calsert was not legally capable of entering into a solemnized marriage, and therefore could not, as a matter of law, meet the statutory requirements for recognition of an unsolemnized marriage. Accordingly, the court dismissed Calsert's petition and denied Calsert's motion to amend as moot.

ISSUE AND STANDARD OF REVIEW

¶9     Calsert now appeals the district court's order of dismissal, entered pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. A district court should grant a rule 12(b)(6) motion only when, "assuming the truth of the allegations" that a party has made and "drawing all reasonable inferences therefrom in the light most favorable" to that party, "it is clear that [the party] is not entitled to relief." *Mitchell v. ReconTrust Co.*, 2016 UT App 88, ¶ 16, 373 P.3d 189 (quotation simplified); *see also Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275 (stating that a dismissal is warranted only when a party "would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim" (quotation simplified)). "Because the propriety of a motion to dismiss is a question of law, we review for correctness, giving no deference to the decision of the [district] court." *McGraw v. University of Utah*, 2019 UT App 144, ¶ 9, 449 P.3d 943 (quotation simplified).

ANALYSIS

¶10     Calsert identifies two potential infirmities with the district court's decision to dismiss her petition. First, she contends that the district court improperly took judicial notice of the court dockets in her 1995 and 2005 divorce cases. Second, she contends that the district court exceeded its authority by declaring invalid part of an order—the nunc pro tunc provision of the NPT Decree—entered in another case by another judge. The Estate contests both of these arguments, and in addition asserts that the court's order of dismissal was proper even if Calsert's two arguments are correct. We address each of these issues in turn.

A

¶11     Calsert first asserts that the district court improperly took judicial notice of the court dockets in her 1995 and 2005 divorce cases. The Estate defends the district court's evaluation of the

court records, pointing out that, as a general matter, courts adjudicating motions to dismiss "may consider documents that are referred to in the complaint and are central to the plaintiff's claim and may also take judicial notice of public records." *See Mitchell v. ReconTrust Co.*, 2016 UT App 88, ¶ 16, 373 P.3d 189 (quotation simplified). The Estate asserts that court documents are "public records" that may be noticed by courts, even in the context of a motion to dismiss.

¶12    We have our doubts about the validity of the Estate's assertion. *See State v. Shreve*, 514 P.2d 216, 217 (Utah 1973) (stating that, while a court may "take judicial knowledge of its own records insofar as those records are a part of the matter before the court," "records of other proceedings in the court cannot be judicially noticed and must be introduced in evidence in order to be considered in the pending case"); *see also In re C.Y.*, 765 P.2d 251, 254 (Utah Ct. App. 1988) ("It is improper for a court to sua sponte take judicial notice of records and proceedings in other actions without giving full notice to the parties and without giving them an opportunity to explain or rebut the judicially noticed facts." (quotation simplified)). And we note that, in the context of a motion to dismiss, a procedural context in which a complainant's allegations must be taken as true, parties are not generally allowed to introduce evidence.[4] If a court elects to consider evidence outside the pleadings while considering a motion to dismiss, the motion must be converted to one for summary judgment, and the non-movant must be

---

4. As noted above, however, courts considering motions to dismiss filed pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure are permitted to consider documents "referred to in the complaint," or that are "central to" the complaint, *see Oakwood Village LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 13, 104 P.3d 1226, as well as certain types of public records, *see Mitchell v. ReconTrust Co.*, 2016 UT App 88, ¶ 16, 373 P.3d 189. But parties may not submit affidavits or other evidence in connection with a motion to dismiss.

afforded an opportunity to introduce competing affidavits and documents. *See Lewis v. U.S. Bank Trust, NA*, 2020 UT App 55, ¶ 10, 463 P.3d 694; *see also* Utah R. Civ. P. 12(b).

¶13 But even if we assume, without deciding, that it was permissible for the district court to have considered the court dockets in connection with the Estate's motion to dismiss, the court must nevertheless "accept [a complainant's] factual allegations as true." *First Interstate Fin. LLC v. Savage*, 2020 UT App 1, ¶ 15, 458 P.3d 1161. In both this case as well as in *First Interstate*, the information from the public records could either be interpreted as contradicting some of the complainant's allegations, or be interpreted as entirely consistent with the complainant's allegations. *See id.* Here, the district court interpreted the court documents in a light least (instead of most) favorable to Calsert's claims—it determined, "because she filed a second petition for divorce" in 2005, that she must have "clearly kn[own] she was not able to marry" Ventura.[5] Such a conclusion does not necessarily follow from the court documents. Calsert's

---

5. We note that the subjective knowledge of the relationship's participants regarding their legal capability of entering into a marriage is not part of the statutory test for recognition of an unsolemnized marriage. *See* Utah Code Ann. § 30-1-4.5(1) (LexisNexis 2019). However, as discussed below, *see infra* ¶ 20, a party seeking recognition of an unsolemnized marriage must not only satisfy the five listed statutory requirements, but must also demonstrate that both parties consented to the arrangement. *See Whyte v. Blair*, 885 P.2d 791, 794 (Utah 1994) (stating that "the party claiming the benefit of an unsolemnized marriage" must show "that at some point mutual consent was given"). Although it is not explicit in the district court's decision, which appears grounded entirely upon the conclusion that Calsert was "not legally capable of entering a solemnized marriage," we presume the court was discussing Calsert's subjective intent in the context of evaluating her ability to have consented to a marriage-like relationship with Ventura.

2005 filing is hardly more detrimental to her cause than her 2018 request for a nunc pro tunc divorce decree; both indicate that, sometime prior to 2005, Calsert learned that her divorce was not final, and that she took steps to remedy the situation. Neither filing is necessarily inconsistent with her allegations that, in 1995, she thought her divorce was final and that she committed to an unsolemnized marriage with Ventura.

¶14 In the context of a motion to dismiss, the court must accept Calsert's allegations as true, and draw all reasonable inferences "in the light most favorable" to Calsert. *Mitchell*, 2016 UT App 88, ¶ 16 (quotation simplified). The district court's treatment of the 2005 court docket indicates that it did not properly apply this standard. Even if it could have properly taken notice of the older court dockets while adjudicating the Estate's motion to dismiss, the court was still required to assume the truth of Calsert's allegations that, in 1995, she thought her divorce was final, and that she believed herself legally capable of, and did commit to, entering into a marriage with Ventura. The court's use of the 2005 court docket to negate the veracity of Calsert's allegations was, in this context, erroneous.

B

¶15 Calsert next asserts that the district court erred when it declared "invalid and not enforceable" the nunc pro tunc provision of the NPT Decree. Calsert's assertion is correct.

¶16 A district judge presiding over one case ordinarily does not possess authority to declare invalid an order entered by another district judge in another case. *See Mascaro v. Davis*, 741 P.2d 938, 946 (Utah 1987) ("One district judge cannot overrule another district court judge of equal authority."); *Richardson v. Grand Central Corp.*, 572 P.2d 395, 397 (Utah 1977) ("Ordinarily one judge of the same court cannot properly overrule the decision of another judge of that court."). Certainly, one district court's legal analysis—for instance, regarding the proper interpretation of a statute—in one case is not binding on another

district court judge in another case in the way an appellate court's legal analysis would be as a matter of vertical stare decisis. *See State v. Menzies*, 889 P.2d 393, 399 n.3 (Utah 1994) (stating that "[v]ertical stare decisis . . . compels a court to follow strictly the decisions rendered by a higher court"), *superseded by constitutional amendment on other grounds as stated in State v. Legg*, 2018 UT 12, 417 P.3d 592. But where a district judge in one case has made a specific factual determination applicable to the parties in that case—for instance, that two parties are divorced, or that an individual was negligent on a particular occasion—another district judge presiding over a different case possesses no authority to second-guess the first judge's determination. The judge presiding over the second case must take the first judge's order as he or she finds it, and ordinarily may not declare it invalid. The authority to reverse, vacate, or otherwise invalidate district court determinations rests with appellate courts, not with other district judges.[6]

---

6. The situation is, of course, different where one judge succeeds another judge, and takes over the first judge's docket. In that situation, the successor judge steps into the shoes of the original judge, and continues to preside over the same cases. *See Build, Inc. v. Utah Dep't of Transp.*, 2018 UT 34, ¶ 31, 428 P.3d 995 (stating that, where one judge takes over for another in the same case, the successor judge is the "same judicial officer" as the first judge, and that, in such a situation, we indulge the "fiction" that "there is no such thing as a predecessor or successor—just the district court" (quotation simplified)); *Blackmore v. L & D Dev. Inc.*, 2016 UT App 198, ¶ 31, 382 P.3d 655 (stating that, when one judge takes over for another in the same case, we view the "two judges, while different persons," to "constitute a single judicial office" (quotation simplified)). In that situation, the successor judge is granted "broad discretion" to "revisit any nonfinal decision entered" in that case by the predecessor judge. *Build, Inc.*, 2018 UT 34, ¶ 27. But this case law is inapposite here, where the court did not simply reconsider a nonfinal order entered by a

(continued…)

¶17 There is a potential exception to this general rule, and that is found in rule 60(d) of the Utah Rules of Civil Procedure, which allows district courts "to entertain an independent action to relieve a party from a judgment, order or proceedings or to set aside a judgment for fraud upon the court."[7] Utah R. Civ. P. 60(d). The Estate invokes rule 60(d) in its appellate brief, and directs our attention to federal case law holding that "independent actions" brought pursuant to the federal version of rule 60(d) do not necessarily need to be filed in the form of a separate lawsuit, and "may be raised by way of defense to a suit seeking to enforce the contested judgment." (Citing *Morrel v. Nationwide Mutual Fire Ins. Co.*, 188 F.3d 218, 223 (4th Cir. 1999)). However, although we are skeptical of the Estate's position—*see In re Estate of Willey*, 2016 UT 53, ¶ 11 n.7, 391 P.3d 171 (refusing to consider a motion as a rule 60(d) "independent action," because "it was not asserted in a separate complaint filed with the [district court] and served on the parties from whom" relief is sought)—we need not reach the question of whether Utah's rule 60(d) should be interpreted in the manner the Estate suggests, because the Estate did not invoke rule 60(d) before the

---

(…continued)

predecessor judge in the same case, but instead declared invalid a final order entered in a different case.

7. We note that rule 60(b) of the Utah Rules of Civil Procedure also allows a court to grant relief from a "judgment, order, or proceeding," but—in contrast to rule 60(d)—such relief is available only by "motion," which must be filed within the same case in which the target judgment or order was entered. Thus, rule 60(b) does not provide an exception to the general rule that a district judge presiding over one case may not invalidate an order entered by another district judge in a different case. To our knowledge, the Estate has not attempted to file a rule 60(b) motion—in Calsert's 1995 divorce case to which it was not a party—seeking relief from the NPT Decree.

district court. Perhaps recognizing this, the Estate posits that, "[i]n substance," it asserted, "by way of its [m]otion to [d]ismiss, a defensive 'independent action' to set aside" the NPT Decree "for fraud upon the court."[8] But neither the Estate's motion to dismiss, nor any of its accompanying papers, made so much as a passing mention of rule 60(d), let alone a specific request that the district court grant relief thereunder. Thus, even if it were possible to invoke rule 60(d) defensively, the Estate made no effort to do so before the district court, where any defenses to such a claim might have been explored, and offers no argument that it should be allowed to do so for the first time on appeal.

¶18    Accordingly, the Estate has not properly invoked the rule 60(d) exception to the general rule that a district judge, presiding over one case, may not declare invalid an order entered in another case by another district judge. At least for purposes of adjudicating the Estate's motion to dismiss, the district court was required to accept the validity of the NPT Decree, including the provision declaring that decree retroactive to August 1995. Its attempt to declare that provision "invalid and not enforceable"

---

8. In addition to offering its viewpoint that the other district judge misapplied his authority to enter a nunc pro tunc order, the district court also definitively stated, in its written order, that Calsert "failed to provide" certain information to the other judge in connection with her efforts to obtain the NPT Decree, and that proper communication of that information to the other judge "would have prevented" the other judge from making the NPT Decree retroactive. We cannot tell, from this record, how the district court would know what information Calsert provided to the judge in the other case, or how it would possibly know what effect any additional information would have had on the other judge's decision; we presume that the court's knowledge came from some source other than informal off-the-record discussions with the other judge, or was mere speculation. It should go without saying that judges should not base their decisions on back-channel conversations with their colleagues.

was improper.[9] Under the terms of the NPT Decree, Calsert was legally capable of entering into a marriage with Ventura as of August 1995. The district court's contrary conclusion, based on its improper determination that the NPT Decree was invalid, was therefore erroneous.

C

¶19　The Estate nevertheless asks us to affirm the district court's order of dismissal, asserting that even if Calsert was, by virtue of the NPT Decree, legally capable of entering into a marriage with Ventura in August 1995, Calsert "cannot be deemed [Ventura's] common law wife as a matter of law."

¶20　In addition to being legally capable of marriage and meeting the four other listed statutory requirements, *see* Utah Code Ann. § 30-1-4.5(1) (LexisNexis 2019), a person claiming an unsolemnized marriage must also demonstrate that both parties consented to the arrangement. *See Volk v. Vecchi*, 2020 UT App 77, ¶ 12; *see also Whyte v. Blair*, 885 P.2d 791, 794 (Utah 1994) (stating that "the party claiming the benefit of an unsolemnized

---

9. It is worth noting that our legislature has specifically authorized district courts to "enter an order nunc pro tunc in a matter relating to marriage, divorce, legal separation or annulment of marriage." Utah Code Ann. § 30-4a-1 (LexisNexis 2019); *see also Horne v. Horne*, 737 P.2d 244, 247 (Utah Ct. App. 1987) (citing comments made by the legislative sponsor of the bill containing that statutory language, indicating that the legislation was necessary to remedy cases of "obvious injustice," including situations where parties, erroneously "believing they were divorced, entered into subsequent marriages"). The propriety of the NPT Decree is not before us, just as it was not before the district court, but we cite this statute here simply to indicate that entry of a nunc pro tunc decree of divorce under circumstances similar to those claimed by Calsert is not necessarily inconsistent with legislative intent.

marriage" must show "that at some point mutual consent was given"). In *Whyte*, the court stated that the consent requirement "has at times been expressed by the statement that a common law marriage must take place immediately or not at all," and that "a relationship illicit in its inception is presumed to be illicit throughout the period of cohabitation." 885 P.2d at 794–95 (citing *In re Estate of Murnion*, 686 P.2d 893, 897–99 (Mont. 1984)).

¶21 Citing this language, the Estate asserts that Calsert's "knowledge and intent" with regard to consent "must be evaluated as they actually existed as of the date she alleges her common law marriage began," which is March 1994. At that point, the Estate argues, Calsert knew that she was still married to Ex-Husband, and even under the NPT Decree, that did not change until August 1995. Because Calsert alleges that the unsolemnized marriage began in March 1994, and because Calsert was still married to Ex-Husband in March 1994, the Estate reasons that the relationship was "illicit in its inception" and must therefore be "presumed to be illicit throughout" the entire period of cohabitation. *See id.* at 795.

¶22 While the Estate's argument is correct as far as it goes, it is ultimately unavailing here, because *Whyte* speaks in terms of a "presumption," *id.*, and its language stands simply for the proposition that there exists a rebuttable presumption that a relationship illicit in its inception has remained illicit throughout its duration, *see Murnion*, 686 P.2d at 897 (relied upon by *Whyte*). A litigant may, of course, rebut any such presumption "by showing that [her] original meretricious relationship changed into a lawful one" at a later date. *Id.* Indeed, in *Murnion*, the court recognized an unsolemnized marriage between a couple whose relationship began in Washington—a state that does not recognize common-law marriages—but continued after a relocation to Montana—a state that does recognize such marriages. *See id.* at 899–900; *cf. Volk*, 2020 UT App 77, ¶¶ 7, 37 (affirming a district court's determination to recognize an unsolemnized marriage effective during the thirty-month period the parties resided in Utah, even though the parties had

cohabited in California—a state that does not recognize unsolemnized marriages—for more than a decade prior to relocating to Utah). Thus, even a relationship that takes root under circumstances not capable of qualifying as a recognizable unsolemnized marriage may later qualify as such under our statute if circumstances change.

¶23 The Estate correctly notes that, given Calsert's allegation in her petition that her relationship with Ventura began in March 1994, while she was still legally married to Ex-Husband, that relationship may have been "illicit in its inception," *see Whyte*, 885 P.2d at 795, and not capable, at its outset, of qualifying as an unsolemnized marriage. The Estate also correctly notes that, given the illicit beginnings of that relationship, there apparently exists a presumption that the relationship continued to be illicit throughout its duration. *Id.; see also Murnion*, 686 P.2d at 897. But Calsert is entitled to rebut that presumption with competent evidence, and is entitled to an opportunity to demonstrate that, at some point during the duration of the relationship, its nature changed from illicit to licit, and that at some point the relationship met all of the requirements for recognition of an unsolemnized marriage, even if it did not at its inception.

¶24 Calsert alleges that, given the NPT Decree, her relationship with Ventura turned licit at some point after August 1995, and that she could thereafter satisfy all of the statutory requirements for recognition of an unsolemnized marriage.[10]

---

10. Calsert's petition claimed that her unsolemnized marriage to Ventura should be recognized as of March 1994. Later, however, perhaps recognizing that the NPT Decree did not render her divorced until August 1995, Calsert filed a motion seeking leave to amend her petition to change the date—from March 1994 to November 1995—on which she sought recognition of an unsolemnized marriage. After granting the Estate's motion to dismiss, the district court denied the motion to amend as moot.

(continued…)

When evaluating the Estate's motion to dismiss, the district court was required to accept those allegations as true. We, of course, cannot say whether further litigation, including discovery, will bear out the veracity of Calsert's allegations. But Calsert has alleged sufficient facts to survive a motion to dismiss, and she is entitled to the opportunity to proceed with her lawsuit and attempt to prove her allegations in further litigation.

CONCLUSION

¶25    The district court erred when it determined, as a matter of law, that Calsert was not legally capable of entering into a marriage with Ventura in 1995. In reaching that determination, the court made improper use of the 2005 court docket, and improperly disregarded the NPT Decree as "invalid." Calsert has alleged facts that, if true, could support recognition of an unsolemnized marriage between herself and Ventura, and she is entitled to further litigation on her petition. We therefore reverse the order dismissing Calsert's petition, and we remand the case for further proceedings consistent with this opinion.

_____

(…continued)
On remand, Calsert will be free to renew that motion in the event she still desires to amend her petition.