**2025 UT App 193**

# THE UTAH COURT OF APPEALS

RAYLYN DANIEL,
Appellant,
*v.*
SETH DANIEL,
Appellee.

Opinion
No. 20230931-CA
Filed December 26, 2025

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
No. 214402674

Jared L. Bramwell, Attorney for Appellant

Seth Daniel, Appellee Pro Se

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

TENNEY, Judge:

¶1     After 17 years of marriage, Raylyn Daniel and Seth Daniel divorced in 2015.[1] Over the next six years, the two lived together part-time, cohabited, and held themselves out in public as still being married. In 2021, Raylyn filed a petition asking the district court to determine that she and Seth had been in an unsolemnized marriage during the intervening years. At the close of a bench trial, however, the district court rejected Raylyn's request, concluding that Raylyn had not proven that Seth had consented

---

1. Because the parties share the same last name, we'll follow our usual practice and refer to them by their first names moving forward, with no disrespect intended by the apparent informality.

to a marital relationship. Raylyn now appeals that ruling. For the reasons set forth below, we affirm.

BACKGROUND[2]

¶2      Raylyn and Seth were married in March 1998, and they divorced in August 2015. For most of their marriage, the couple lived in Salt Lake City, but after their divorce, Seth briefly moved to California. While in California, Seth attended a church congregation for single adults, dated several women, and otherwise lived as a single man. Raylyn encouraged Seth to date

---

2. As will be discussed below, the district court heard evidence during a bench trial about what did and did not occur during the years in question. The parties agreed on some factual questions, but they disagreed on many others. Where the district court resolved the conflicts one way or the other, we'll recite those facts in the light most favorable to the district court's ruling. *See Knowles v. Knowles*, 2022 UT App 47, n.2, 509 P.3d 265. Where the district court did not resolve a particular factual dispute, we'll recount the facts that were agreed upon by the parties.

We also note that marriages of the type that are at issue in this appeal are often referred to as "common law marriages." But these kinds of marriages have been a creature of statute in Utah since 1987. *See* Utah Code § 81-2-408 (setting forth the current requirements for such a marriage); *Volk v. Vecchi*, 2020 UT App 77, ¶ 12, 467 P.3d 872 (discussing the prior history of this statute). As a result, it's something of a misnomer to refer to these marriages as "common law marriages," so we'll generally refer to them as "unsolemnized marriages" in this opinion. That said, we regard the two terms as being interchangeable. And since the term "common law marriage" is quite common in both the record and the caselaw, we'll leave references to "common law marriage" untouched to avoid unnecessary bracketing and clutter.

and told him, "[D]o whatever you would do as if you were free and available."

¶3     Seth returned to Salt Lake City to spend Thanksgiving 2015 with the family. During that trip, Raylyn initially insisted that the two sleep in different rooms, stating, "We can't be together. We're divorced." But the two engaged in sexual intercourse during that trip, and they also had discussions about maintaining some sort of relationship moving forward.

¶4     Raylyn and the couple's five children moved from Salt Lake City to St. George in the summer of 2016. Seth was the "sole owner" of the St. George house, but Raylyn paid the mortgage and utilities. Around this time, Seth also purchased and was the sole owner of a house in Nampa, Idaho.

¶5     From 2016 to 2021, Seth split his time between St. George and Nampa, spending months at a time in the two different locations. The two oldest children later testified that, during the months when Seth was with the family in St. George, the relationship between Raylyn and Seth appeared "normal" and consistent with them still being married. During the same period, Raylyn and Seth also referred to themselves as husband and wife to various neighbors, friends, and fellow church members. Raylyn continued to use Daniel as her surname, later explaining that she did so because it was "the name that [her] children" have and because she "was with Seth, and [they] were a family." Raylyn and Seth also continued to maintain the same joint bank account that they had created and used during their marriage.

¶6     During this period, Raylyn repeatedly suggested to Seth that they should "get remarried," but when she did, Seth repeatedly told her no. Raylyn later testified that Seth would respond to her requests with statements such as, "[N]o, we're not quite ready, the timing is not right. No, let's just wait. It will happen . . . eventually, but it's just not the right timing."

¶7 Raylyn and Seth's relationship began to worsen in early 2021, and on March 1, 2021, they signed a handwritten document that was titled "Couples Agreement." This document laid out several stipulations regarding the nature of their relationship, property, and finances. One provision stated that "common law marriage is not going to ever be an option for Raylyn & Seth" and that "[a]ny future marriage between them must be by mutual consent."

¶8 On July 12, 2021, the two signed a notarized "Contract and Agreement" (the Contract). At the outset, the Contract stated that it was intended to establish "the terms of [the parties'] divorce, property, custody and any and all matters that may be disputed now or in the future." The Contract then stated that Raylyn and Seth had been "legally divorced" in August 2015 and were "not currently married." And it then stated:

> The parties are entering this contract to ensure that at this, and any future time, no common law or statutory marriage can or will ever be created between them by any court or law. The parties do not wish to enter any legal statutory, or common law marriage, and therefore mutually declare that they are not legally married by the laws of this, or any state, country or nation, and that they do not intend any contract, behavior, cohabitation, or any future action to give effect or authority to any law or court to ever declare that such a legal or statutory secular relationship or liability exists between them.

¶9 Raylyn and Seth's relationship continued to deteriorate, and in August 2021, Seth called police in Nampa and alleged that Raylyn had made a "suicidal threat." When police arrived, Raylyn told officers that she and Seth "secretly got a divorce 5 years ago" but that they had "decided to try to make it work." Raylyn also told officers that "she wanted to get remarried" but that Seth "did not."

¶10 In October 2021, Raylyn filed a petition asking the district court to determine that she and Seth had been in an unsolemnized marriage since 2015. In his answer, Seth denied that such a marriage had been established, and the case proceeded to a bench trial in August 2023.

¶11 At trial, Raylyn, Seth, two of their children, two of their children's friends, and several of Raylyn's friends and family members testified. Although Raylyn and Seth disagreed on many facts, they testified consistently with the facts presented above.

¶12 In September 2023, the district court issued a written ruling denying Raylyn's petition. At the outset of this ruling, the court expressed its concern over both parties' "credibility issues," and it cited several examples where each party had testified in a manner that was inconsistent with documented evidence or testimony from other witnesses. The court thus stated that it was "not willing to accept anything from either party on face value" but that it would instead largely base its ruling on the documents before it, testimony from other witnesses, or facts that had been agreed upon by both Raylyn and Seth.

¶13 Turning to the statute, the court ruled that Raylyn had satisfied several of the required elements. In particular, the court concluded that the parties were of legal age and legally capable of giving consent, that they had cohabited, and that they had "[held] themselves out as and [had] acquired a uniform and general reputation as husband and wife."

¶14 But the court then concluded that Raylyn had not proven "mutual consent." The court observed that mutual consent is an "essential" element under the statute. The court then acknowledged caselaw under which a party can establish consent through such things as joint bank accounts, the purchase of joint property, sharing a surname, or speaking of each other as being married in the presence of third parties. *See, e.g.*, *Volk v.*

*Vecchi*, 2020 UT App 77, ¶ 27, 467 P.3d 872. And the court acknowledged that there was some evidence that such things had occurred here—including the continued use of a joint bank account, Raylyn's continued use of the Daniel surname, and the fact that the two referred to each other as spouses to friends and family.

¶15    But even with such evidence, the court determined that Raylyn had not proven mutual consent. Instead, the court credited the "contrary evidence" showing that Seth had not consented. The court was particularly persuaded by two things. First, it pointed to the "contracts [and] the agreements that were executed by the parties which clearly state[d] that there was no such relationship." And second, the court referred to the testimony showing that Raylyn "had repeatedly asked [Seth] to remarry her and that he had declined."

¶16    The court thus concluded that because the statute requires the parties "to consent to get married, whether it's a common law marriage or a solemnized marriage," and because it couldn't "find that there was" such consent, "no common law marriage or unsolemnized marriage was ever created." The court accordingly denied Raylyn's petition.

ISSUE AND STANDARD OF REVIEW

¶17    Raylyn challenges the district court's conclusion that she had not proven that Seth consented to an unsolemnized marriage. "We review the district court's interpretation of the common law marriage statute for correctness, but we review the court's findings of fact for clear error and its application of the statute to those findings for abuse of discretion." *Volk v. Vecchi*, 2020 UT App 77, ¶ 9, 467 P.3d 872 (quotation simplified).

ANALYSIS

¶18 The question of whether an unsolemnized marriage was established is governed by Utah Code section 81-2-408.[3] As set forth there:

> A marriage that is not solemnized according to this chapter is legal and valid if a court or administrative order establishes that the marriage arises out of a contract between two individuals who:
>
> (a) are of legal age and capable of giving consent;
>
> (b) are legally capable of entering a solemnized marriage under the provisions of this chapter;
>
> (c) have cohabited;
>
> (d) mutually assume marital rights, duties, and obligations; and
>
> (e) . . . hold themselves out as and have acquired a uniform and general reputation as spouses.

*Id.* § 81-2-408(1).

¶19 The party who seeks the establishment of an unsolemnized marriage bears "the burden of proving the elements," *Rivet v. Hoppie*, 2020 UT App 21, ¶ 9, 460 P.3d 1054, and that party must

---

3. At the time of both the events in question and the district court's ruling, the governing statute was Utah Code section 30-1-4.5. In 2024, the Legislature renumbered that statute as Utah Code section 81-2-408. The Legislature also made some changes to the statute, but because those changes do not affect any of the elements we address in this opinion, we'll cite the current version for convenience.

do so by "a preponderance of the evidence," *Hansen v. Hansen*, 958 P.2d 931, 935 (Utah Ct. App. 1998). While "no single factor is determinative, . . . each required element must be established by sufficient evidence." *Volk v. Vecchi*, 2020 UT App 77, ¶ 12, 467 P.3d 872 (quotation simplified).

¶20    As noted, the district court ruled that Raylyn had proven several of the required elements, including that the parties were of legal age, were legally capable of giving consent, had cohabited, and had held themselves out as and acquired a uniform and general reputation as spouses. But even so, the district court determined that Raylyn had not proven "mutual consent."

¶21    As an initial matter, we note that mutual consent is not listed as one of the enumerated elements in the unsolemnized marriage statute. *See* Utah Code § 81-2-408. But our courts have nevertheless held that it must be proven. In *Whyte v. Blair*, for example, our supreme court stated that the statute "requires general reputation, cohabitation, and assumption of marital obligations as separate elements in addition to consent." 885 P.2d 791, 795 (Utah 1994). The court thus held that "the party claiming the benefit of an unsolemnized marriage" "must" show "that at some point mutual consent was given." *Id.* at 794. In *Calsert v. Estate of Flores*, we likewise held that "a party seeking recognition of an unsolemnized marriage must not only satisfy the five listed statutory requirements, but must also demonstrate that both parties consented to the arrangement." 2020 UT App 102, ¶ 13 n.5, 470 P.3d 464.

¶22    This makes sense. As indicated, the statute states upfront that an unsolemnized marriage "arises out of a contract between two individuals who" satisfy the various elements that are then set forth. Utah Code § 81-2-408(1). This comports with the general understanding that "marriage is contractual in nature" and is "based on the mutual consent of the parties." 23 Williston on Contracts § 62:26 (4th ed.). Because "it is a basic principle of

contract law that there can be no contract without the mutual assent of the parties," *Livingston v. Finco Holdings Corp.*, 2022 UT App 71, ¶ 14, 513 P.3d 94 (quotation simplified), it naturally follows that, as with a solemnized marriage, the parties to an unsolemnized marriage must mutually consent to the establishment of the marriage.

¶23 This leads to the question of what it is, exactly, that the mutual consent element requires. In *Whyte*, our supreme court explained that each party must "consent[] to be married." 885 P.2d at 794. The court observed that such a marriage exists when the parties "have by their prior consent and conduct entered into a marital relationship," albeit one that "was not theretofore formally solemnized or otherwise legally recognized." *Id.* at 793. In this sense, such a marriage exists when the parties "consensually assumed marital obligations . . . without solemnization." *Id.* at 794. Following this lead, we've likewise said that the evidence must "demonstrate that both parties consented to the arrangement," *Calsert*, 2020 UT App 102, ¶ 20, meaning that each party "consent[ed] to the rights and responsibilities that accompany *a legally recognized marital relationship*," *Volk*, 2020 UT App 77, ¶ 27 (emphasis added, quotation otherwise simplified).

¶24 Our decision in *Hansen* bears some similarity to the facts of this case and is illustrative of how the consent element plays out. There, the parties (who were referred to in our opinion as "Mr. Hansen" and "Ms. Hansen") "had been married and divorced prior to" a subsequent period of "cohabitation." 958 P.2d at 933. "During that cohabitation period, Mr. and Ms. Hansen had, at least for a time, held themselves out to some as being married." *Id.* (quotation simplified). But this was not uniform—they "did not refer to each other as husband and wife in public and their closest friends did not believe the two were married." *Id.* And of some note, "Mr. Hansen asked Ms. Hansen several times to formally remarry him" during this period, but "Ms. Hansen repeatedly rejected Mr. Hansen's proposals." *Id.*

¶25 Mr. Hansen subsequently asked the court to determine that an unsolemnized marriage existed. *Id.* But the district court rejected this request, in part, because of its conclusion that Ms. Hansen had not "consented to the existence of a marital relationship after the previous divorce." *Id.* On appeal, we affirmed that conclusion. In doing so, we regarded it as persuasive evidence that "Ms. Hansen [had] repeatedly rejected Mr. Hansen's requests to formally remarry." *Id.* at 936. In our view, this supported the district court's conclusion that "Ms. Hansen did not want or consent to the rights and responsibilities that accompany a legally recognized marital relationship." *Id.*

¶26 In light of this precedent, we see no reversible error in the district court's conclusion that Raylyn did not prove that there was consent in this case. While the district court found that Raylyn's testimony was generally not credible, it specifically *did* credit her testimony that, during the 2015 to 2021 period, Raylyn had "repeatedly asked [Seth] to remarry her and that he had declined." And reviewing the trial transcript ourselves, we note that Raylyn testified that she asked Seth several times if he wanted to get married and that Seth would "would always tell [her] no," and we further note that she testified that Seth said some version of this "multiple times." Moreover, we also note that, during the August 2021 police incident, Raylyn told officers that she and Seth "secretly got a divorce 5 years ago" and that while "she wanted to get remarried," Seth "did not."

¶27 Like the district court below, we regard this as fairly conclusive proof that while Seth may have been willing to do such things as cohabit with Raylyn, continue to maintain a joint bank account, and even refer to her as his wife to friends and family, he was expressly unwilling to "consent[] to be married," *Whyte*, 885 P.2d at 794, or assume "the rights and responsibilities that accompany a legally recognized marital relationship," *Volk*, 2020 UT App 77, ¶ 27 (quotation simplified).

¶28 This conclusion is also corroborated by the two documents that the parties signed in 2021. As discussed, Raylyn and Seth signed a "Couples Agreement" in March 2021. This document stated that "common law marriage is not going to ever be an option for Raylyn & Seth" and that "[a]ny future marriage between them must be by mutual consent." In July 2021, Raylyn and Seth then signed and notarized the Contract. This document stated that Raylyn and Seth were "not currently married"; that "at this, and any future time, no common law or statutory marriage can or will ever be created between them by any court or law"; and that Raylyn and Seth did "not wish to enter any legal statutory, or common law marriage, and therefore mutually declare that they are not legally married." This, too, suggests that Seth (and, indeed, Raylyn as well) had not consented at that time to the establishment of a marital relationship.

¶29 Raylyn nevertheless pushes back on several fronts. But we find none of them persuasive.

¶30 First, Raylyn points out that consent may be proven circumstantially, such as by the "maintenance of joint banking and credit accounts," "the sharing of a spouse's surname by the other spouse," and "speaking of each other in the presence of third parties as being married." *Volk*, 2020 UT App 77, ¶ 27 (quotation simplified). And Raylyn then points to evidence presented at trial (and accepted by the district court) showing that many of these things happened here.

¶31 This is all true enough, and in some or perhaps many cases, such evidence may be enough to persuade a court that both parties did consent to the establishment of a marital relationship. But what matters here is that there was *also* evidence showing that the subject of marriage repeatedly came up and that when it did, Seth repeatedly told Raylyn that he was unwilling to remarry her. The district court accepted and credited this evidence, and it naturally follows from this evidence that Seth was not agreeing to

assume "the rights and responsibilities that accompany a legally recognized marital relationship." *Id.* (quotation simplified).

¶32 Second, Raylyn challenges the court's reliance on the two agreements that she signed in 2021. In her view, these were only forward-looking, and they were accordingly irrelevant to the question of whether she and Seth had previously agreed to the establishment of a marital relationship during the 2015 to 2021 period. But this claim is at odds with the fairly strident language that was used in the documents themselves. The Contract, for example, included language stating that Raylyn and Seth were "not *currently* married," that they wanted to "mutually declare that they [were] not legally married," and that no "common law or statutory marriage" could be created "*at this*" or "any future time." (Emphases added.) Since the parties were expressly disclaiming the possibility of creating an unsolemnized marriage "at this" time, then, like the district court, we think these documents are inconsistent with the assertion that Raylyn and Seth had previously agreed to "a marital relationship," albeit one that had simply not been "formally solemnized." *Whyte*, 885 P.2d at 793.[4]

¶33 Third, Raylyn claims that when she acknowledged that Seth had repeatedly told her that he did not want to get remarried

---

4. At trial, Raylyn claimed that the Contract was a "fraudulent document" and that she had "never" seen it before. But when pressed on the matter, Raylyn agreed that her signature was on the document. And again, in its ruling, the district court found that Raylyn was an unreliable witness generally, and it more particularly found that her testimony that she had not seen or signed the Contract was not credible. While Raylyn challenges this conclusion in her brief, she has not adequately briefed any such argument. In any event, on matters of credibility, "we defer to the district court." *In re Discipline of Steffensen*, 2018 UT 53, ¶ 32, 428 P.3d 1104. We are not persuaded that the court committed any error in accepting and relying on that document.

(i.e., in both her trial testimony and in her statement to officers in August 2021), she only meant that he was saying no to a solemnized marriage. But in many places at trial, Raylyn's testimony was not at all this specific. In one relevant exchange, for example, Raylyn acknowledged that she "kept asking [Seth] to *marry*" her and that he "would always tell [her] no." These refusals from Seth seem to have been rejections to the idea of marriage at all, whether solemnized or not.[5] And in any event, we certainly see no error in the district court's decision to interpret them that way.

¶34    Finally, Raylyn challenges two evidentiary rulings that the court made at trial: namely, (i) the court sustained a relevancy objection to Raylyn's attempt to question Seth about some emails from January 2021 that purportedly contained some discussion of whether they had an unsolemnized marriage, and (ii) the court

---

5. From our review of the transcript, there's one potential exception. At trial, Raylyn testified that, during the Thanksgiving holiday in 2015, the two agreed that they would fix the "mistake" of getting divorced by keeping things "the same as they had been before," "not tell anyone that that divorce had ever happened," and eventually "legalize" their relationship. Raylyn then responded affirmatively to a question from her counsel about whether she and Seth had agreed "to remain married together."

But again, as noted, the district court found that Raylyn was not a credible witness. And while it credited some particular portions of her testimony—including, notably, her testimony that Seth had repeatedly said he did not want to get remarried—it never credited Raylyn's account of the alleged Thanksgiving agreement. We accordingly are not persuaded that we can rely on this passage from her testimony, much less that it is sufficient to overcome the other proof of Seth's nonconsent that is discussed above.

also sustained a relevancy objection to evidence that Seth was not paying child support from 2015 to 2021.[6]

¶35    But on the record before us, we're not persuaded that, even if these rulings were somehow erroneous, Raylyn was prejudiced in any meaningful way. The January 2021 emails are not in the record—the court sustained the objection before Raylyn tried submitting them, and Raylyn has not sought to supplement the appellate record to include them. As a result, we have no way to evaluate their contents. In any event, even if it were true that the parties were discussing the possibility of an unsolemnized marriage in January 2021, that discussion predated the two documents discussed above in which they stated that there was no such marriage at that time. And again, such a discussion is also at odds with Seth's repeated refusals over the years to remarry Raylyn. As for the child support issue, even if it were true that Seth was not paying child support during the intervening years, this is several inferential steps away from proving that Seth had affirmatively agreed to an unsolemnized marriage. Even if this was relevant, we regard its probative value in the face of the other evidence as being marginal at best.

¶36    In short, our decision to affirm the district court's decision is ultimately holistic as opposed to granular. As with any other fact-laden question, the district court was empowered to view the evidence that was before it collectively. And because Raylyn was "the party claiming the benefit of an unsolemnized marriage," Raylyn had the burden of proving, by a preponderance of the evidence, "that at some point mutual consent was given." *Whyte*, 885 P.2d at 794. As discussed, Raylyn did point to some evidence that could have circumstantially suggested that there had been mutual consent. But there was also direct evidence to the contrary, including Seth's repeated refusals to marry Raylyn, as well as the

---

6. In Raylyn's view, Seth's failure to pay child support showed that he thought they were still married and was therefore not required to follow the dictates of their divorce decree.

two documents that expressly disclaimed the existence of either a legally binding marital relationship in general or an unsolemnized marriage in particular.

¶37 In light of all this, we see no basis for overturning the district court's conclusion that Raylyn did not prove that Seth had "consented to be married," *id.*, or that he had "consent[ed] to the rights and responsibilities that accompany a legally recognized marital relationship," *Volk*, 2020 UT App 77, ¶ 27 (quotation simplified). We therefore affirm the court's rejection of Raylyn's petition on this basis.[7]

---

7. In her brief, Raylyn also challenges several of the district court's subsidiary rulings (mostly evidentiary in nature and some that were about credibility) that related to some of the enumerated elements from the unsolemnized marriage statute. But as noted, Raylyn prevailed on those elements, so she's essentially faulting the district court for concluding that she should have prevailed on those elements by even more proof than she already did. We fail to see how any such error could have been harmful. Regardless, as indicated, Raylyn was required to prove "each required element . . . by sufficient evidence," *Volk*, 2020 UT App 77, ¶ 12, and mutual consent is one of the required elements to establish an unsolemnized marriage. Because we affirm the district court's conclusion that Raylyn did not prove mutual consent, we have no need to address these additional arguments.

On the issue of consent, we also note that there is an interesting question lurking in the shadows of all this. As noted, *Whyte v. Blair* held that there must be mutual "consent[] to be married." 885 P.2d 791, 794 (Utah 1994). But it also suggested that what's at issue is whether the parties, "by their prior consent and conduct[,] entered into a *marital relationship*, although it was not theretofore formally solemnized or otherwise legally recognized." *Id.* at 793 (emphasis added). In *Calsert v. Estate of Flores*, we held that the petitioner must "demonstrate that both parties consented

(continued…)

CONCLUSION

¶38 Raylyn has not persuaded us that the court committed any reversible error with respect to its rejection of her petition for the establishment of an unsolemnized marriage. We therefore affirm.

———————

to *the arrangement*," 2020 UT App 102, ¶ 20, 470 P.3d 464 (emphasis added), and in *Volk*, we held that the question is whether the parties "consent[ed] to the *rights and responsibilities* that accompany a legally recognized marital relationship," 2020 UT App 77, ¶ 27 (emphasis added, quotation otherwise simplified).

We think it's at least conceptually possible that there could be a case in which the parties agreed to assume all the "rights and responsibilities" of a marriage and also did the various other things required by the statute (such as cohabiting and holding themselves out as being married), but they never explicitly discussed whether they were intending or consenting to establish an informal or unsolemnized marriage. In other words, it's at least possible, we think, that when *Whyte* referred to "consent[] to be married," 885 P.2d at 794, this included consent to "a marital relationship," *id.* at 793, which could mean something more like a *marriage-like* relationship in the absence of any discussion of marriage itself. And this possibility may well be why the cases sometimes allow consent to be proven through circumstantial evidence. *See, e.g.*, *id.* at 795; *Volk*, 2020 UT App 77, ¶ 27.

But as discussed, that's not the case before us here. Again, the district court accepted evidence showing that Seth pointedly did not want to be married, in any way, and that he expressly and repeatedly told Raylyn as much. So what our decision here should be understood to mean is that in a case in which there was proof that one party expressly disavowed any intention to be married, whether solemnized or not, that will likely be enough to defeat a request for an unsolemnized marriage. But we think there's at least some open question as to what would happen if the parties never discussed marriage at all but nevertheless did agree to a marriage-like relationship.